SERCARZ & RIOPELLE, LLP

CARNEGIE HALL TOWER
152 WEST 57TH STREET, 24TH FLOOR
NEW YORK, NEW YORK 10019

1-212-586-4900
FACSIMILE 1-212-586-1234
www.sercarzandriopelle.com

ROLAND G. RIOPELLE
MAURICE H. SERCARZ*

———
*ADMITTED IN NY & NJ

May 17, 2009

BY FAX AND ECF

Hon. John G. Koetl
United States District Judge
500 Pearl Street, Rm. 1030
New York, NY  10007

Re: <u>United States v. Blech,</u>
02 Cr. 0122 (JGK)

Dear Judge Koetl:

I write to respond briefly to AUSA Andrew Fish's letter of May 12, 2009.  In his May 12 letter, Mr. Fish asks the Court to modify the defendant's terms of supervised release by ordering him to serve his remaining term of supervised release in the United States, rather than in France, where he resides with his family and is employed.  For the following reasons, the Court should reject Fish's application.

In his May 12 letter, Mr. Fish concedes that Mr. Blech has not been charged with any violation of the terms of his supervised release at this point, and that the only issue before the Court is whether Mr. Blech's terms of supervised release should be modified to require him to live apart from his family in the United States, rather than in France,

where he resided with his family before his arrest and after service of his sentence, and where he is now employed.[1]  In deciding the issue of whether to modify Mr. Blech's supervised release to require him to live in the United States, I respectfully request that the Court consider the fact that the modification sought by Mr. Fish will cause Mr. Blech to lose the job he now has (and one of the terms of the defendant's supervised release is that he "work regularly at a lawful occupation"), and will make it very difficult for him to "support his .. dependents and meet other family responsibilities" (another term of the defendant's supervised release).  The regime envisioned by Mr. Fish amounts to Mr. Blech's exile in the United States for the remaining term of his supervised release.

I also take issue with Mr. Fish's suggestion that Mr. Blech has committed a crime when he caused a lawsuit to be filed in Curacao by a law firm that is apparently of the opinion that Credit Bancorp. NV has a viable claim against the Receiver based on the Receiver's lack of authority to act in connection with a corporate entity formed in the Netherlands Antilles.  There does appear to be a real dispute as to whether the Receiver acted without proper authority in Curacao, as is evidenced by the correspondence previously submitted to the Court by Andre Small, Esq.[2]  Under these circumstances, I

---

[1]  In the course of making this concession, AUSA Fish cites United States v. Eisen, 974 F.2d 246 (2d Cir. 1992) in support of the suggestion that false allegations in a lawsuit may form the basis of a mail fraud charge.  While Blech agrees that, in some circumstances, proceedings in a civil case may amount to a mail fraud, the Eisen case is a far cry from the events complained of here.  In Eisen, members of a law firm that specialized in personal injury cases were charged with filing and pursuing lawsuits based on perjurious testimony, phony evidence, false documents, bribed witnesses and a myriad of other forms of fraudulent conduct.  924 F.2d at 251.  By pursuing the utterly phony claims at issue in Eisen, the plaintiffs' attorneys were able to recover significant sums from the defendants and their insurers. In this case, the government suggests that inaccurate statements contained in a Netherlands Antilles pleading, which are not really material to the principal claims in the Netherlands Antilles lawsuit, which were immediately recognized as false by the defendant in the Netherlands Antilles lawsuit, and which have (assuming the translation we have received is correct) been corrected by Mr. Blech, are somehow comparable to the situation in Eisen. That is simply not so.  The claim asserted in the Netherlands Antilles lawsuit is based principally on the allegation that the Receiver in the lawsuit commenced by the SEC in the United States acted without proper authority when he seized the assets of Credit Bancorp. NV.  (Translation of MCM Translators, ¶¶ 4.1-4.7). The misstatements described in the translation of the Netherlands Antilles lawsuit concerning Blech's arrest and the criminal proceedings in the United States are really not material to these claims, and are therefore utterly unlike the situation in Eisen, where the personal injury claims at issue were based entirely on bogus allegations and evidence, and were pursued in many cases through jury trials at which the bogus evidence was presented.  Moreover, the Netherlands Antilles pleadings are based partly on the application of Dutch law to the facts, and therefore constitute, at least in part, opinions of Andre Small, Esq. rather than purely factual statements.  An example of this would be the references to "coercion" (see, e.g., Translation, ¶ 3.5) which is a concept of continental law.

[2]  There also seems to be a real issue as to whether the Receiver has properly managed the assets of Credit Bancorp. NV, and whether he has improperly depleted the equity of Credit Bancorp. Attached as Exhibit A is an accounting recently filed by the Receiver, indicating that the total credits and deposits taken in by the Receiver were $258, 227,941.47, and the totals paid out by the Receiver were $257,095,948.86, *including $198,890,072.71 paid to the customers of Credit Bancorp. and $23,866,945.60 paid out in "professional fees."*  According to the Receiver's August 28, 2007 letter to AUSA Fish, attached as Exhibit B, the "total claims of CBL customers ... amounted to $194,802,966.24."  Thus, it appears that there has been a payment to the Credit Bancorp customers that exceeded their claims and depleted the equity of Credit Bancorp. NV.  And the payment of the "professional fees" charged against the estate is arguably excessive. If those fees were reduced by only 20%, there would be a net gain to the equity of Credit Bancorp. NV of more than $4 million.

2

SERCARZ & RIOPELLE, LLP

respectfully submit that Mr. Blech did not act unlawfully or maliciously in causing the Curacao lawsuit to be filed, and therefore there is no reason to modify Mr. Blech's supervised release to ensure that he "is more likely to act in a lawful manner" during the remaining term of his supervised release, because the filing of the Curacao lawsuit is the only allegedly problematic conduct that the government has been able to identify to date.

In his letter, Mr. Fish also suggests that the Netherlands Antilles lawsuit will somehow deplete the receivership estate. By making this allegation, Mr. Fish shows his true colors – he is a stalking horse for the Receiver, and this whole proceeding is brought to compel Mr. Blech to cause Credit Bancorp to drop its claim against the Receiver, by threatening him with exile in the United States. Mr. Fish, like the Receiver before him, ignores the fact that the Netherlands Antilles lawsuit is directed at the Receiver in personam and therefore should not deplete receivership estate. The Receiver should not be permitted to indemnify himself from the estate he allegedly failed to manage properly, if damages are assessed against him in the Netherlands Antilles.

When Mr. Fish suggests that Mr. Blech should be compelled to live in the United States to "ensure that Blech will comply with the law and court orders," it seems fair to ask what difference Mr. Blech's residence here in the United States will make. If Mr. Blech believes that Credit Bancorp. has a valid claim against the Receiver in Curacao, there is no term of his supervised release that prevents him from asserting it, no matter where he may be living, so long as that claim is not fraudulent. So forcing Mr. Blech to live in the United States would have little effect on Mr. Blech's ongoing disputes with the Receiver, which are being fought out in France and Curacao as well as the Southern District of New York, and which, presumably, will be fought out to the end by all parties in the various forums where the claims have been asserted.

For all these reasons, I respectfully request that the Court decline to modify Mr. Blech's supervised release by ordering him to return to the United States.

Respectfully submitted,

Roland G. Riopelle

Cc:    AUSA Andrew Fish, Esq.
       USPO Peter Merrigan

3

# EXHIBIT A

 KPMG

Credit Bancorp
Summary of Receivership Deposits and Disbursements

| | Credits / Deposits | Debits / Disbursements | REF |
|---|---|---|---|
| **Broker Dealer Security Summary** | | | |
| Value of Securities Based on 5 Day 11/2003 Valuation | 122,194,447.77 | | A |
| Centigram Shares | 23,273,775.00 | | B |
| Gain / Loss on Securities | 299,444.90 | | A |
| | 145,767,667.67 | - | 145,767,667.67 |
| | | | |
| **Receivership Accounts** | | | |
| Centigram Proceeds | 12,094,425.00 | | C |
| Deutsche Bank Settlement | 11,914,500.00 | | C |
| Insurance Settlement | 58,250,000.01 | | C |
| Other Settlements (UCS, Jeffrey Weston, Anklong, Shadlaus) | 720,438.96 | | C |
| Swiss Accounts | 2,570,581.68 | | C |
| Cash from Broker Dealer Accounts | 9,447,903.26 | | C |
| Miscellaneous Deposits | 988,736.86 | | C |
| Income Generated By Citifunds Premium US Treasury Reserves (103478) | 1,778,221.02 | | D |
| Income Generated By Citigroup Private Bank, Insurance Settlement Account (597079) | 582,429.74 | | D |
| Income Generated By Citigroup Private Bank, Deutsche Escrow (597477) | 722,642.26 | | D |
| | 99,069,878.79 | - | 99,069,878.79 |
| | | | |
| **CBL Customer Distribution** | | | |
| Initial Distribution - Security Deliveries Based on 5 Day 11/2003 Valuation | | 118,136,974.15 | E |
| Initial Distribution - Cash Distributed for Securities Sold | | 247,390.64 | F |
| Initial Distribution - Cash Distributed | | 40,143,183.10 | G |
| Hardship Loans Granted by Receiver | | 1,652,279.38 | H |
| Initial Distribution - Cash Distributed for Dividends | | 26,866.08 | I |
| Distribution of Centigram Shares | | 23,273,775.00 | B |
| Undertaking Payments by CBL Customers | 12,870,337.09 | | J |
| Other Payments by CBL Customers | 520,057.92 | | K |
| Second Distribution | | 28,799,999.37 | L |
| | 13,390,395.01 | 212,280,467.72 | (198,890,072.71) |
| | | | |
| **Professional Fees** | | | |
| Receivership Invoices | | 1,963,969.81 | M |
| Morrison & Foerster Invoices | | 10,847,170.77 | M |
| Other Invoices | | 11,055,805.02 | M |
| | - | 23,866,945.60 | (23,866,945.60) |
| | | | |
| **Other Expenses / Fees** | | | |
| Expenses - Other (i.e. Court Ordered / Other Legal Fees) | | 289,663.58 | N |
| Expenses - Taxes | | 1,350.00 | N |
| Other Fees | | 71,600.14 | N |
| | - | 362,613.72 | (362,613.72) |
| | | | |
| **Broker Dealer Margin Balances** | | | |
| Payment of Broker-Dealer Margin Balances | | 20,585,021.82 | O |
| | - | 20,585,021.82 | (20,585,021.82) |

Subject to Change

KPMG

Credit Bancorp
Summary of Receivership Deposits and Disbursements

| | Credits / Deposits | Debits / Disbursements | REF |
|---|---|---|---|
| TOTALS | 258,227,941.47 | 257,095,048.86 | 1,132,892.61 |

Balance of Premium US Treasury Reserves (103478) on 12/31/2008          1,124,487.46
Balance of Citigroup Private Bank, Business Checking (59240594) on 12/31/2008          8,245.85
          1,132,733.31

Difference in calculated and actual amounts          159.30

Subject to Change

# EXHIBIT B

| MORRISON | FOERSTER |
|---|---|

1290 AVENUE OF THE AMERICAS     MORRISON & FOERSTER LLP
NEW YORK                                              NEW YORK, SAN FRANCISCO,
NEW YORK 10104-0050                          LOS ANGELES, PALO ALTO,
                                                           SAN DIEGO, WASHINGTON, D.C.
TELEPHONE:212.468.8000           DENVER, NORTHERN VIRGINIA,
FACSIMILE:212.468.7900           ORANGE COUNTY, SACRAMENTO,
                                                           WALNUT CREEK, CENTURY CITY
WWW.MOFO.COM                        TOKYO, LONDON, BEIJING,
                                                           SHANGHAI, HONG KONG,
                                                           SINGAPORE, BRUSSELS

Writer's Direct Contact
212/468-8128
CLoewenson@mofo.com

August 28, 2007

By Email and UPS

Andrew Fish, Esq.
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
One St. Andrews Plaza
New York, NY 10007

Re:  Receiver's Opposition To Request To Modify Richard Blech's Restitution Obligation

Dear Mr. Fish:

I write to respond to Roland Riopelle's August 6, 2007 letter to Judge Koeltl requesting that
the Court find that Richard Blech's restitution obligation has been satisfied. Mr. Riopelle's
assertion appears to be based on a misunderstanding of the CBL Receivership's activities.
While the Receivership has had substantial success in returning assets to the victims of the
CBL fraud, I have by no means been able to compensate all of the victims' losses, nor do I
have any present expectation that I will be able to do so. Accordingly, I respectfully request
that the U.S. Attorney's Office oppose Mr. Riopelle's request.

Pursuant to the Plan of Distribution and subsequent orders approved by Judge Sweet in
*SEC v. Credit Bancorp*, the total claims of CBL customers (based on deposits of cash and
securities into CBL) amounted to $194,802,966.24. In accordance with Judge Sweet's
Implementation Order issued on November 7, 2003, I made an initial distribution to CBL
customers of $145,626,634.58 in cash and securities. After taking the first distribution into
account (and after offsetting for monies that customers had received from CBL prior to the
filing of the SEC action, in the amount of $7,861,131.82), the remaining customer claims
against the Receivership totaled $41,315,199.84. Pursuant to the Second Implementation
Order, which was approved by Judge Sweet in February of this year, I distributed another
$28,800,000.00 to CBL customers. Thus, at this time, the Receivership still faces
outstanding claims from CBL customers of $12,506,699.84.[1] At this time I have not been
able to identify assets of CBL from which I can reasonably expect to satisfy these claims.

---

[1] This figure also reflects a small additional distribution directed by Judge Sweet in March of this year.

**MORRISON | FOERSTER**

Andrew Fish, Esq.
August 28, 2007
Page Two

Accordingly, I must disagree with Mr. Riopelle's contention that "the Receiver has
distributed to the victims $10 million more than Mr. Blech is required to pay in restitution."
As Mr. Riopelle recognizes, Judge Koeltl intended the restitution order to remain in place as
long as Mr. Blech's restitution payments (taken together with restitution paid by any other
defendant) had not "fully covered all of the compensable injuries." *See* August 6, 2007
Letter from Roland Riopelle at 2 (quoting the transcript of Mr. Blech's June 3, 2005
sentencing hearing at 32-33).

As noted above, at this time the CBL customers still have claims of $12,506,699.84 that
remain unsatisfied. I am unable to state at this time whether and to what extent the
Receivership will be able to satisfy these claims in the future. Accordingly, I request that the
U.S. Attorney's Office oppose Mr. Riopelle's application in the form presented. However,
because the amount of unsatisfied customer claims has now been reduced to an amount that
is lower than Mr. Blech was ordered to pay as restitution, I would not oppose an application
by Mr. Blech to lower the restitution amount to equal the balance of remaining customer
claims against the Receivership.

Please let me know if you require any additional information.

Very truly yours,

Carl H. Loewenson, Jr.

cc:    Thomas M. Melton, Esq.
       United States Securities and Exchange Commission

ny-769916